DMP:SKW
F. #2021R00318

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

ILYA BALAKAEV,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Filed Under Seal
File Date: February 21, 2023
Case Number: 23-cr-00079
Judge Frederic Block
Magistrate Judge Vera M. Scanlon

I N D I C T M E N T

Cr. No. _____
(T. 18, U.S.C., §§ 371, 554(a),
 981(a)(1)(C), 2 and 3551 et seq.; T.
21, U.S.C., § 853(p); T. 28, U.S.C.,
§ 2461(c); T. 50, U.S.C., §§ 1705(a),
1705(c), 4819, 4819(d)(1) and
4819(d)(2); T. 15, C.F.R., §§ 736.2,
746.4, 746.8 and 764.2)

THE GRAND JURY CHARGES:

## INTRODUCTION

At all times relevant to this Indictment, unless otherwise indicated:

I.    The Defendant and His Co-Conspirators

        1.    The defendant ILYA BALAKAEV was a 47-year-old Russian national who resided in Moscow, Russia.   Since at least 2017, BALAKAEV served as the Chief Executive Officer and owner of Radiotester LLC, a company based in Moscow, Russia. BALAKAEV previously worked at the Russian Ministry of Culture through which he traveled to China and the Democratic People's Republic of Korea ("DPRK," also referred to as "North Korea") as part of his official duties.   A photograph of BALAKAEV is below.



2.      The defendant ILYA BALAKAEV, through Radiotester LLC, repaired electronic equipment used to measure signal frequencies and transmit encrypted signals. The devices BALAKAEV repaired were commonly used as part of counterintelligence measures to detect hidden surveillance devices and to transmit covert communication.   On its website, which was written in Russian, Radiotester LLC advertised itself as "helping to quickly resolve issues of supply and repair of foreign-made measuring equipment" and noted that the company had a "positive experience of working with large federal . . . industrial enterprises."

3.      FSB Co-Conspirator 1 and FSB Co-Conspirator 2 were government officials employed by the Federal Security Service of the Russian Federation ("FSB"), the principal intelligence and security agency of the Russian government and the main successor agency to the Soviet Union's KGB.   FSB Co-Conspirator 1 and FSB Co-Conspirator 2 worked for FSB Military Unit 43753, which is part of the FSB's Communications Security Center, also known as FSB Center 8, which was responsible for the Russian government's communication security and cryptology.   Both FSB Co-Conspirator 1 and FSB Co-

Conspirator 2 contracted with the defendant ILYA BALAKAEV for Radiotester LLC to repair electronic equipment used by the FSB for counterintelligence measures.

4.      Individual 3, an individual whose identity is known to the Grand Jury, was a United States Lawful Permanent Resident who was born in Russia and resided in Richmond, Virginia.   Individual 3 assisted the defendant ILYA BALAKAEV in purchasing electronic equipment in the United States.

5.      DPRK Government Official 1, an individual whose identity is known to the Grand Jury, was the First Secretary of the Embassy of the DPRK to the Russian Federation, based in Moscow, Russia.   DPRK Government Official 1 contracted with defendant ILYA BALAKAEV to purchase a gas detector and gas detector operating manual for the DPRK.

II.     Relevant Statutory and Regulatory Background

A.     The International Emergency Economic Powers Act and Relevant Sanctions

6.      The International Emergency Economic Powers Act ("IEEPA"), codified at Title 50, United States Code, Sections 1701 through 1708, conferred upon the President the authority to deal with unusual and extraordinary threats to the national security and foreign policy of the United States.   Section 1705 provided, in part, that "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter."   50 U.S.C. § 1705(a).

7.      In 2014, pursuant to his authority under the IEEPA, the President issued Executive Order 13660, which declared a national emergency with respect to Russia's violation of the sovereignty of Ukraine by asserting authority over the Crimean region.   To

address this national emergency, the President blocked all property and interest in property that were then in, or thereafter came within, the United States or the possession or control of any United States person, or individuals determined by the Secretary of the Treasury to meet one or more enumerated criteria. These criteria included, but were not limited to, individuals determined to be responsible for or complicit in or who engaged in actions or policies that threatened the peace, security, stability, sovereignty or territorial integrity of Ukraine; or who materially assisted, sponsored or provided financial, material or technological support for, or goods or services to, individuals or entities engaging in such activities.

8.      Executive Order 13660 prohibited, among other things, transferring, paying, exporting, withdrawing or otherwise dealing in any interest in property in the United States owned by a person whose property and interests in property were blocked (a "blocked person"), as well as the making of any contribution or provision of funds, goods or services by a United States person to or for the benefit of a blocked person and the receipt of any contribution or provision of funds, goods or services by a United States person from any such blocked person.

9.      The national emergency declared in Executive Order 13660 with respect to the situation in Ukraine remained in continuous effect since 2014 and was renewed on March 2, 2022, following Russia's further invasion of Ukraine.

10.      On multiple occasions, the President expanded the scope of the national emergency declared in Executive Order 13660, including through: (1) Executive Order 13661, issued on March 16, 2014, which addressed the actions and policies of the Russian Federation with respect to Ukraine, including the deployment of Russian Federation military

forces in the Crimea region of Ukraine; and (2) Executive Order 13662, issued on March 20, 2014, which addressed the actions and policies of the Government of the Russian Federation, including its purported annexation of Crimea and its use of force in Ukraine.   Executive Orders 13660, 13661 and 13662 were collectively referred to as the "Ukraine-Related Executive Orders."   On February 21, 2022, the President again expanded the scope of the Ukraine-Related Executive Orders, finding that the Russian Federation's purported recognition of the so-called Donetsk People's Republic and Luhansk People's Republic regions of Ukraine threatened the peace, stability, sovereignty and territorial integrity of Ukraine.

11.    The Ukraine-Related Executive Orders authorized the Secretary of the Treasury to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President under the IEEPA, as necessary to carry out the purposes of those orders.   The Ukraine-Related Executive Orders further authorized the Secretary of the Treasury to redelegate any of these functions to other offices and agencies of the United States Government.

12.    To implement the Ukraine-Related Executive Orders, the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") issued certain Ukraine-Related Sanctions Regulations.   These regulations incorporated by reference the prohibited transactions set forth in the Ukraine-Related Executive Orders.   See 31 C.F.R. § 589.201.   The regulations also provided that the names of persons designated directly by the Ukraine-Related Executive Orders, or by OFAC pursuant to the Ukraine-Related Executive Orders, whose property and interests were therefore blocked, would be published

in the Federal Register and incorporated into the Specially Designated Nationals and Blocked

Persons List (the "SDN List"), published on OFAC's website.   Id. n.1.

13.    On December 28, 2016, and again on March 15, 2018, the Department

of the Treasury placed the FSB on the SDN List for its role in significant malicious cyber-

enabled activities, pursuant to Executive Order 13757, and other destabilizing activities,

pursuant to the Countering America's Adversaries Through Sanctions Act, codified at 22

U.S.C. § 9524.   Providing funds, goods or services to the FSB was prohibited, with some

limited exceptions.   See 31 C.F.R. § 578.201 and Executive Order 13694.

14.    Willful violations of the Ukraine Related Sanctions Regulations and

related Executive Orders constituted criminal offenses under IEEPA.   See 50 U.S.C.

§ 1705(c).

B.    The Export Control Reform Act and Export Administration Regulations

15.    The Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-

774, which were promulgated by the United States Department of Commerce ("DOC"),

Bureau of Industry and Security ("BIS"), regulate the export of goods, technology and

software from the United States.   Under the Export Control Reform Act ("ECRA"), it was a

crime to violate, attempt to violate, conspire to violate or cause a violation of any regulation,

order, license or authorization issued pursuant to the statute, including the EAR.   See 50

U.S.C. § 4819(a)(1).   Willful violations of the EAR constituted criminal offenses under the

ECRA.   See 50 U.S.C. § 4819(b).

16.    Through the EAR, the BIS reviewed and controlled the export of

certain items from the United States to foreign countries.   See 15 C.F.R. §§ 734.2, 734.3.

In particular, the BIS placed restrictions on the export and reexport of items that it

determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.   Under the EAR, such restrictions depended on several factors, including the destination country, the end user and the end use of the item.

17.     The most sensitive items subject to the EAR controls were identified on the Commerce Control List ("CCL"), set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1.   Items listed on the CCL were categorized by Export Control Classification Number ("ECCN"), each of which was subject to export control requirements depending on destination, end use and end user of the item.

18.     The BIS published the names of certain foreign persons—including businesses, research institutions, government and private organizations, individuals and other types of legal persons—that were subject to specific license requirements for the export, reexport and/or transfer (in-country) of specified items.   These persons comprised the Entity List, found at Title 15, Code of Federal Regulations, Part 774, Supplement Number 4.   The persons on the Entity List were subject to individual licensing requirements and policies supplemental to those found elsewhere in the EAR, due to a determination that such persons had engaged in activities contrary to United States national security and/or foreign policy interests.

19.     On January 4, 2017, FSB was added to the Entity List by the DOC; therefore, a license was required to export all items subject to the EAR, with some limited exceptions, to the FSB.   See 82 Fed. Reg. 724 (Jan. 4, 2017); see also 82 Fed. Reg. 18,219 (Apr. 18, 2017) (revision).   Generally, license applications to export items subject to the EAR to the FSB were subject to a policy of denial.   See 15 C.F.R. §§ 746.8(b) and

744.21(e).   On March 2, 2021, the Department of State designated the FSB pursuant to Executive Order 13382 for its contributions to the proliferation of weapons of mass destruction.   Thus, exports to the FSB were prohibited under 15 C.F.R. § 744.8.

20.    Additionally, BIS implemented broad based controls for items and activities subject to the EAR in support of U.S. national security and foreign policy.   50 U.S.C. § 4811(1)-(2).   These controls included restrictions on exports and reexports to the DPRK for United Nations ("UN") and anti-terrorism reasons.   15 C.F.R. §§ 746.4, 742.19. Consistent with ECRA and UN Security Council Resolutions, with limited exception, a license was required to export or reexport any item subject to the EAR to North Korea.   15 C.F.R. § 746.4.   The DPRK was also subject to a UN Security Council arms embargo, and thus, militarily sensitive items were also restricted.   15 C.F.R. § 746.1(b)(2).   Furthermore, the Secretary of State designated the DPRK a state sponsor of terrorism and implemented additional restrictions on it. 15 C.F.R. § 742.19(a)(2)-(3).   For example, additional prohibitions applied to certain items destined for military, police, intelligence or other sensitive end users or if an item would make a significant contribution to the military potential of the DPRK.   15 C.F.R. § 742.19(a)(3); Supplement No. 2 to part 742.

21.    Federal law also required that any international shipment where a valid export license was required or where the commodity classified was worth more than $2,500 be logged in the Automated Export System ("AES") via an Electronic Export Information ("EEI") filing.   Failure to make an EEI filing or providing false or misleading information in an EEI filing in the AES constituted a violation of 13 U.S.C. § 305.

III.   Overview of the Criminal Schemes

22.    Since at least January 2017, the defendant ILYA BALAKAEV and others conspired to export electronic devices subject to the EAR to Russia.   BALAKEV purchased electronic devices in the United States, arranged for their export to Russia, and then used them to repair equipment for the FSB and to sell to the DPRK, in violation of United States laws.   The devices BALAKEV purchased, repaired and sold to the FSB and DPRK were items commonly used as part of sensitive foreign counterintelligence and military operations, including to scan a room to determine if it was bugged, to transmit encrypted communications and to detect hazardous gases.

23.    In furtherance of the scheme, the defendant ILYA BALAKAEV used a network of individuals in the United States to assist him in purchasing electronic equipment. BALAKAEV purchased the devices on the internet or directly through United States-based manufacturers and shipped the devices to Individual 3's home in Richmond, Virginia. Then, often traveling through the Eastern District of New York, BALAKAEV flew to the United States to pick up the devices and brought them back to Russia or had Individual 3 and others ship the devices from the United States to Russia.   On occasion, BALAKAEV directed others to travel with the devices from the United States to Russia.   BALAKAEV subsequently used parts from the devices to repair FSB equipment or provided the equipment directly to a DPRK official.

24.    In an electronic communication, the defendant ILYA BALAKAEV demonstrated his awareness of the applicable United States export control laws, which prohibited him from purchasing these devices in the United States and selling them to the FSB and DPRK.   On or about November 5, 2019, Individual 3 emailed BALAKAEV a

hyperlink to a BIS document titled "Don't Let This Happen To You!: Actual Investigations of Export Control and Antiboycott Violations." In the email, Individual 3 wrote to BALAKAEV to "Take a look just in case." The BIS document provided "an introduction to the consequences of violating U.S. export control law." In addition to explaining the United States export control laws, the document noted specific examples of individuals who violated United States sanction regulations by exporting items to Russia without a BIS license. BALAKAEV subsequently downloaded the document and saved the document to his computer.

  A. <u>Scheme to Sell U.S. Espionage Equipment to the FSB in Russia</u>

    25. The defendant ILYA BALAKAEV and his co-conspirators unlawfully sourced, purchased, shipped and transported spectrum analyzers and signal generators from vendors and manufacturers in the United States for the benefit of the FSB in Russia. Spectrum analyzers are generally used to detect the frequency of radio signals to identify surveillance devices. Signal generators are generally used to securely transmit information, often as part of counterintelligence or other covert operations. Because many of the spectrum analyzers and signal generators that the FSB used were manufactured in the United States, it was difficult for the FSB to obtain parts to repair the devices. BALAKAEV, therefore, was required to purchase the devices in the United States in order to repair the FSB's devices in Russia.

    26. The spectrum analyzers that defendant ILYA BALAKAEV purchased in the United States and used to repair FSB devices were included on the CCL and classified under Export Control Classification Number 3A992.a. A license was required to export

them to the FSB.   Neither the defendant ILYA BALAKAEV nor Radiotester LLC had a license to export such items to the FSB and never applied for a license.

27.     As part of the scheme, defendant ILYA BALAKAEV conspired with FSB Co-Conspirator 1 and FSB Co-Conspirator 2, who worked in FSB Center 8's Military Unit 43753.   FSB Co-Conspirator 1 and FSB Co-Conspirator 2 published on publicly available Russian websites requests for proposals ("RFPs") to repair certain devices.

28.     Defendant ILYA BALAKAEV, FSB Co-Conspirator 1 and FSB Co-Conspirator 2 then negotiated a contract price to repair the devices before BALAKAEV submitted a bid in response to the RFP.   To ensure that BALAKAEV won the bid, FSB Co-Conspirator 1 and FSB Co-Conspirator 2 instructed BALAKAEV to submit two higher bids under fictious company names, in addition to the agreed-upon bid through BALAKAEV's company, Radiotester LLC.

29.     Once the FSB accepted Radiotester LLC's bid and the contract was signed, defendant ILYA BALAKAEV traveled to FSB Center 8 in Russia to pick up the broken device.   Either FSB Co-Conspirator 1 or FSB Co-Conspirator 2 met BALAKAEV outside the secure gate of Center 8 to hand over the devices.

30.     The defendant ILYA BALAKAEV then sourced the necessary repair parts from the United States.   BALAKAEV purchased the devices over the internet or directly from the manufacturers and had the devices shipped to Individual 3's home in Richmond, Virginia.   Once purchased, BALAKAEV brought or shipped the devices from the United States to Russia where he mined the devices for component parts to use to repair the FSB devices.   A photograph saved on BALAKEV's mobile device of BALAKAEV repairing a spectrum analyzer is below.



31.     Once the defendant ILYA BALAKAEV repaired the devices, he
returned to FSB Center 8.   FSB Co-Conspirator 1 or FSB Co-Conspirator 2 met
BALAKAEV outside the secure gate to obtain the devices.   A photograph of the secure gate
of FSB Center 8 where BALAKAEV met the FSB officers is below.



13

32.     The FSB Military Unit 43753 then wired payment to defendant ILYA BALAKAEV's Sberbank account, the Russian majority state-owned banking and financial services company.

33.     In total, between approximately 2017 and the present, the defendant ILYA BALAKAEV entered into approximately ten contracts with FSB Military Unit 43753 to repair approximately 40 spectrum analyzers and signal generators.   In furtherance of those contracts, BALAKAEV purchased approximately 43 devices in the United States. BALAKAEV frequently traveled between Russia and the United States during that time to obtain the devices, often through John F. Kennedy International Airport ("JFK Airport") in the Eastern District of New York.   In furtherance of the scheme to unlawfully export controlled items from the United States to the FSB, on or about and between February 2017 and March 2021, BALAKAEV traveled from Russia to the United States approximately 14 times, typically staying in the United States anywhere from 2 to 14 days on each trip.

34.     For example, according to a January 2018 procurement document and invoice, FSB Military Unit 43753 and the defendant ILYA BALAKAEV through Radiotester LLC entered into a "State contract for the repair of measuring equipment for State needs." As part of the contract, BALAKAEV agreed to repair various spectrum analyzers.   On four separate occasions in 2018, BALAKAEV traveled from Russia to the United States to fulfil the contracts, including for approximately five days in February 2018; approximately four days in April 2018; approximately three days in July 2018; and approximately seven days in December 2018.

35.     On or about December 19, 2019, the defendant ILYA BALAKAEV through Radiotester LLC entered into another contract with the FSB Military Unit 43753.

The contract was to repair an Agilent HP 8562EC and two Agilent HP 8560EC devices. According to purchase records and shipment notifications, BALAKAEV purchased two Agilent HP 8560E spectrum analyzers that were delivered to Individual 3's home in Richmond, Virginia on or about January 14, 2020 and January 15, 2020.

36.     One month later, on or about February 10, 2020, defendant ILYA BALAKAEV flew from Russia to the United States, where he stayed for approximately one week, in order to obtain the spectrum analyzers that he purchased.   While in the United States, on or about February 17, 2020, BALAKAEV e-mailed FSB Co-Conspirator 1 with the subject of the email "Repair Contracts 43753" and attached a PDF about spectrum analyzers.

37.     The following month, in or about March 2020, the defendant ILYA BALAKAEV purchased an Agilent HP 8562EC spectrum analyzer to fulfill the FSB contract.   On or about March 21, 2020, the device was delivered to Individual 3's home in Richmond, Virginia.

38.     Later, in October 2020, FSB Military Unit 43753 and the defendant ILYA BALAKAEV through Radiotester LLC entered into another contract to repair spectrum analyzers.   Specifically, according to an FSB procurement document dated October 15, 2020, BALAKAEV agreed to repair an Agilent HP 8562EC, an HP 8560EC, a Rohde & Schwarz FSH4 and an Anritsu MS2711E.

39.     The defendant ILYA BALAKAEV and FSB Co-Conspirator 1 discussed the new contract over email.   In a series of e-mail messages dated on or about and between October 12, 2020 and November 12, 2020, with the subject line "Request for 43753," FSB Co-Conspirator 1 wrote to the defendant ILYA BALAKAEV stating: "[w]e

sent/attached a request for a quote for the repair of Spectrum Analyzers." FSB Co-Conspirator 1's e-mail was signed "Sincerely, Representative of FGKU," which stands for "Federal State-Owned Institution" and is used to describe Russian governmental entities, including FSB Military Unit 43753. BALAKAEV responded, in sum and substance, that he was providing information "regarding restoration of functional characteristics of measuring equipment" and listed information related to spectrum analyzers.

40.     On or about October 20, 2020, the defendant ILYA BALAKAEV flew from Russia to the United States, through JFK Airport, and stayed in the United States for approximately seven days. While in the United States, on or about October 27, 2020, BALAKAEV purchased an Agilent HP 8560A spectrum analyzer. BALAKAEV had the device shipped to Individual 3's home in Richmond, Virginia. Approximately one month later, on or about November 21, 2020, BALAKAEV purchased an Agilent HP 8563EC on the internet and, again, had it shipped to Individual 3's home in Richmond, Virginia.

41.     On or about November 27, 2020, the defendant ILYA BALAKAEV flew from Russia to the United States, through JFK Airport, and stayed in the United States for approximately nine days. While in the United States, the Agilent HP 8563EC was delivered to Individual 3's home in Richmond, Virginia. BALAKAEV then returned to Russia with the spectrum analyzers. BALAKAEV subsequently repaired the FSB spectrum analyzers with parts from the devices that he purchased in the United States and returned the devices to the FSB.

42.     In addition to the devices discussed above, between approximately April 16, 2020 and March 6, 2021, the defendant ILYA BALAKAEV purchased approximately 30 additional spectrum analyzers, spectrum analyzer parts and other radio

parts he shipped to Individual 3's home in Richmond, Virginia.   BALAKAEV also traveled to the United States twice in 2021 to obtain the devices and fulfill his FSB contracts.

43.     In approximately January 2022, defendant ILYA BALAKAEV through Radiotester LLC entered into a new contract with FSB Military Unit 43753 to repair six spectrum analyzers and signal generators, including the following makes and models: HP8648D; Agilent HP 8562E; Agilent HP 8562EC; Rohde & Schwarz FS300; and Rohde & Schwarz SM300.   In approximately February 2022, BALAKAEV picked up the devices from FSB Co-Conspirator 1 at FSB Center 8 to begin the process of procuring spectrum analyzers for use in repairing the devices.

B.      Scheme to Sell United States Gas Detection Equipment to the DPRK

44.     Between approximately 2019 and 2020, the defendant ILYA BALAKAEV conspired with DPRK Government Official 1, the First Secretary of the Embassy of the DPRK to the Russian Federation, to provide the DPRK with United States technology that could detect hazardous gases, in violation of United States laws.

45.     In approximately 2019, DPRK Government Official 1 contacted the defendant ILYA BALAKAEV to discuss business they could engage in together.   DPRK Government Official 1 contacted BALAKAEV due to the connections that BALAKAEV made while working at the Russian Ministry of Culture and in his travel to North Korea. BALAKAEV subsequently met DPRK Government Official 1 multiple times at the North Korean embassy in Moscow, Russia.   On one of those occasions, DPRK Government Official 1 asked BALAKEV to purchase an Altair 4X gas detector for the DPRK.   The Altair 4X gas detector was a device manufactured by a company in the United States that

could be used to detect deadly gases such as combustible gases, oxygen-deficient atmospheres and toxic gases.

46.    On approximately December 28, 2019, the defendant ILYA BALAKAEV purchased the Altair 4X gas detector on the internet in the United States and had it shipped to Individual 3's home in Richmond, Virginia.   On January 2, 2020, the shipment arrived at Individual 3's home.

47.    Approximately two months later, on or about February 9, 2020, DPRK Government Official 1 sent the defendant ILYA BALAKAEV a photograph of a broken CD labeled "Altair 4XR Multigas Detector."   BALAKAEV responded, in sum and substance, that he would send a link for the gas detector software.

48.    The next day, on or about February 10, 2020, the defendant ILYA BALAKAEV traveled from Russia to the United States to obtain the gas detector that was previously shipped to Individual 3's home.   Approximately one week later, on or about February 17, 2020, the defendant returned to Russia with the gas detector.

49.    On approximately February 27, 2020, DPRK Government Official 1 asked defendant ILYA BALAKAEV if he was back in Russia and BALAKAEV responded "yes, I am at your service."   The two then discussed procuring software that corresponded with the gas detector.   BALAKAEV told DPRK Government Official 1 that "the disk can be ordered from America."   DPRK Government Official 1 stated, in sum and substance, that a flash drive would be better and that he wanted the original without any viruses, and BALAKAEV responded "accepted."

50.    On or about March 2, 2020, DPRK Government Official 1 asked when he could meet the defendant ILYA BALAKAEV to obtain the gas detector and software.

BALAKAEV arranged to meet later that week to provide the American gas detector software to DKRP Government Official 1.

51.     A license from the DOC was required to export the gas detector to the DPRK.  Neither the defendant ILYA BALAKAEV nor Radiotester LLC had such a license to export the item to the DPRK and never applied for a license.

## COUNT ONE
(Conspiracy to Defraud the United States)

52.     The allegations contained in paragraphs one through 51 are realleged and incorporated as if fully set forth in this paragraph.

53.     In or about and between January 2017 and January 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ILYA BALAKAEV, together with others, did knowingly and intentionally conspire to defraud the United States by impairing, impeding, obstructing and defeating, through deceitful and dishonest means, the lawful governmental functions of OFAC and BIS, both agencies of the United States, in the enforcement of economic sanctions laws and regulations, and the issuance of licenses relating to the export of goods and the provision of financial services.

54.     In furtherance of the conspiracy and to affect its objects, within the Eastern District of New York and elsewhere, the defendant ILYA BALAKAEV, together with others, did commit and cause the commission of, among others, the following:

## OVERT ACTS

(a)     In or about January 2018, BALAKAEV entered into a contract with FSB Military Unit 43753 to procure spectrum analyzers.

(b)     In or about December 2019, BALAKAEV entered into a contract with FSB Military Unit 43753 to procure spectrum analyzers.

(c)     In or about October 2020, BALAKAEV entered into a contract with FSB Military Unit 43753 to procure spectrum analyzers.

(d)     In or about and between January 2017 and January 2022, BALAKAEV purchased 40 spectrum analyzers and signal generators in the United States, which required a license from BIS to export to the FSB.

(e)     In or about and between January 2017 and January 2022, BALAKAEV traveled from Russia to the United States approximately 17 times to obtain the spectrum analyzers.

(f)     In or about and between January 2017 and January 2022, BALAKAEV transported and caused to be transported spectrum analyzers from the United States to Russia to be used to repair devices for the FSB.

(g)     In or about and between December 2019 and February 2020, BALAKAEV purchased an Altair 4X gas detector in the United States, which required a license from BIS to export to the DPRK.

(h)     In or about February 2020, BALAKAEV traveled from Russia to the United States to obtain the Altair 4x gas detector and transported and caused to be transported the item to Russia.

(i)     In or about and between February 2020 and March 2020, BALAKAEV provided the Altair 4x gas detector to DPRK Government Official 1 for the benefit of the DPRK.

(Title 18, United States Code, Sections 371 and 3551 et seq.)

## COUNT TWO
### (Conspiracy to Violate IEEPA)

55.     The allegations contained in paragraphs one through 51 are realleged and incorporated as if fully set forth in this paragraph.

56.     In or about and between January 2017 and January 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ILYA BALAKAEV, together with others, did knowingly and willfully conspire to violate the IEEPA, contrary to 50 U.S.C. § 1705, Executive Order 13692, and 31 C.F.R. § 578.20, to wit: ILYA BALAKAEV and his co-conspirators knowingly and willfully caused U.S. persons and entities to provide goods and services to and for the benefit of the FSB without first obtaining the required approval of OFAC, contrary to Executive Order 13692 and 31 C.F.R. § 578.201.

(Title 50, United States Code, Sections 1705(a) and 1705(c); Title 18, United States Code, Sections 3551 et seq.)

## COUNT THREE
### (Conspiracy to Violate ECRA)

57.     The allegations contained in paragraphs one through 51 are realleged and incorporated as if fully set forth in this paragraph.

58.     In or about and between January 2017 and January 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ILYA BALAKAEV, together with others, did knowingly and willfully conspire to violate and to cause one or more violations of licenses, orders, regulations and prohibitions issued under the Export Control Reform Act, to wit: ILYA BALAKAEV and his co-conspirators did agree to export and cause to be exported from the United States to the FSB

items on the Commerce Control List, set forth in Title 15, Code of Federal Regulations, part 774, Supplement Number 1, without having first obtained a license for such export from the U.S. Department of Commerce.

(Title 50, United States Code, Section 4819; Title 15, Code of Federal Regulations, Sections 736.2, 746.8 and 764.2)

COUNT FOUR
(Conspiracy to Violate ECRA)

59.     The allegations contained in paragraphs one through 51 are realleged and incorporated as if fully set forth in this paragraph.

60.     In or about and between January 2019 and March 2020, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ILYA BALAKAEV, together with others, did knowingly and willfully conspire to violate and to cause one or more violations of licenses, orders, regulations and prohibitions issued under the Export Control Reform Act, to wit; ILYA BALAKAEV and his co-conspirators did agree to export and cause to be exported from the United States to the DPRK an item subject to the Export Administration Regulations, without having first obtained a license for such export from the U.S. Department of Commerce.

(Title 50, United States Code, Section 4819; Title 15, Code of Federal Regulations, Sections 736.2, 746.4 and 764.2)

COUNT FIVE
(Smuggling Goods from the United States)

61.     The allegations contained in paragraphs one through 51 are realleged and incorporated as if fully set forth in this paragraph.

62.     In or about and between January 2017 and January 2022, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant ILYA BALAKAEV, together with others, did fraudulently and knowingly export and send from the United States, merchandise, articles and objects, to wit: items on the Commerce Control List, set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1, contrary to United States laws and regulations, to wit: Title 50, United States Code, Section 4819 and Title 15, Code of Federal Regulations, Sections 736.2, 746.8 and 764.2, and did fraudulently and knowingly receive, conceal and facilitate the transportation and concealment of such merchandise, articles and objects, prior to exportation, knowing the same to be intended for exportation, contrary to such United States laws and regulations.

(Title 18, United States Code, Sections 554(a), 2 and 3551 et seq.)

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS TWO AND FIVE

63.     The United States hereby gives notice to the defendant that, upon his conviction of either of the offenses charged in Counts Two and Five, the government will seek forfeiture in accordance with Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), which require any person convicted of such offenses to forfeit any property, real or personal, constituting, or derived from, proceeds traceable to such offenses.

64.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

to seek forfeiture of any other property of the defendant up to the value of the forfeitable

property described in this forfeiture allegation.

(Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States

Code, Section 853(p); Title 28, United States Code, Section 2461(c))

## CRIMINAL FORFEITURE ALLEGATION
## AS TO COUNTS THREE AND FOUR

65.     The United States hereby gives notice to the defendant that, upon his

conviction of either of the offenses charged in Counts Three and Four, the government will

seek forfeiture in accordance with Title 50, United States Code, Section 4819(d)(1), which

requires any person convicted of such offenses to forfeit any of the person's property (a)

used or intended to be used, in any manner, to commit or facilitate the offenses; (b)

constituting or traceable to the gross proceeds taken, obtained or retained, in connection with

or as a result of the offenses; and/or (c) constituting an item or technology that was exported

or intended to be exported in violation of the Export Control Reform Act.

66.     If any of the above-described forfeitable property, as a result of any act

or omission of the defendant:

(a)     cannot be located upon the exercise of due diligence;

24

(b)     has been transferred or sold to, or deposited with, a third party;

(c)     has been placed beyond the jurisdiction of the court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property which cannot be

divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p),

as incorporated by Title 50, United States Code, Section 4819(d)(2), to seek forfeiture of any

other property of the defendant up to the value of the forfeitable property described in this

forfeiture allegation.

(Title 50, United States Code, Sections 4819(d)(1) and 4819(d)(2); Title 21,

United States Code, Section 853(p))


A TRUE BILL

_Mary Beth Glickman_
/FOREPERSON

_Breon Peace_
BREON PEACE
UNITED STATES ATTORNEY
EASTERN DISTRICT OF NEW YORK

F.#: 2021R00318

FORM DBD-34
JUN. 85

No.

# UNITED STATES DISTRICT COURT

EASTERN *District of* NEW YORK

## CRIMINAL DIVISION

### THE UNITED STATES OF AMERICA

*vs.*

ILYA BALAKAEV,

Defendant.

# INDICTMENT

(T. 18, U.S.C., §§ 371, 554, 981(a)(1)(C), 2 and 3551 et seq.; T. 21, U.S.C., § 853(p); T. 28, U.S.C., § 2461(c); T. 50, U.S.C., §§ 1705(a), 1705(c), 4819, 4819(d)(1) and 4819(d)(2); T. 15, C.F.R., §§ 736.2, 746.4, 746.8 and 764.2)

*A true bill.*

*Mary Beth Glickman* _____

*Foreperson*

*Filed in open court this* _____ *day,*

*of* _____ *A.D. 20* _____

_____
*Clerk*

*Bail, $* _____

_____

Sara K. Winik, Assistant U.S. Attorney (718) 254-6058